IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FORTUNATO J. MENDES       *
#203114
      v.                    *   CIVIL ACTION NO. DKC-02-4030

JAMES PEGUESE,  WARDEN and    *
THE ATTORNEY GENERAL OF THE
     STATE OF MARYLAND        *
                               ******

## MEMORANDUM

Now before the court is the Amended Petition of Maryland prisoner Fortunato J. Mendes for

Writ of Habeas Corpus (Paper Nos. 1 and 5),  the State's Answer thereto (Paper No. 19), and

Petitioner's replies.[1] (Paper Nos. 29, 30, 31, 42 and 43).[2]   After review of these papers, the court

finds no need for an evidentiary hearing.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the*

*United States District Courts; see also* 28 U.S.C. Section 2254(e)((2).  For the reasons that follow,

the Petition will be DENIED and DISMISSED WITH PREJUDICE.

## I. Procedural History

Petitioner was charged on September 12, 1988, in the Circuit Court for Anne Arundel

County with first degree murder and use of a handgun in the commission of a crime of violence.

(Paper No. 19, Ex. 1).  On August 22-25, 1989, and August 28-September 1, 1989, Petitioner was

tried before a jury presided over by the Honorable Bruce C. Williams.  *(Id.)*

---

[1]Petitioner, in his traverse, spends several pages disputing and contradicting evidence adduced at trial.  To the extent these arguments address claims raised by Petitioner in his original and amended habeas petitions, the information has been considered by the court.  However, to the extent Petitioner intended this information to further amend his grounds for relief, such undertaking is denied.

[2]In light of the United States Court of Appeals for the Fourth Circuit's decision in *Thompson v. Greene*, 429 F.3d 263 (4th Cir.  2005), Respondents were directed to serve Petitioner with copies of all exhibits.  (Paper No. 36).  This they have done. (Paper Nos. 38 and 40).

The facts adduced at trial, as described by the Maryland Court of Special Appeals, were as follows:

> The prosecution contended that on June 15, 1988, at approximately 6:40 a.m., Mendes shot and killed David[3] Diggs. Diggs intended to testify against Mendes the following day at Mendes's trial on distribution of cocaine charges. The defense theorized that Diggs, a police informant and drug dealer, made many enemies and that many people had a motive to kill him. Mendes adduced evidence of an alibi when the shooting occurred.

> Madeline Stokes, Diggs's mother, testified that on the morning of June 15 Diggs left their home in the Oyster Harbor section of Anne Arundel County to go to work. As he walked from the house, a short, stocky black male chased him down and shot him several times in the back. Allegedly, Stokes questioned her son at the scene. According to Stokes, Diggs said that "Fortunato the lawyer" shot him.[1] Previously, Stokes averred, Diggs told her that a lawyer named Fortunato warned Diggs not to testify against him. Mendes produced evidence that, although the police and the media interviewed Stokes at the scene, she never mentioned this conversation. Almost a month after Mendes's arrest, Stokes reported the statements to Detective Dirk Rinehart of the Anne Arundel County Police.

> A number of Diggs's neighbors reported that they heard shots and observed either the chase itself or, shortly after the shooting, a man enter a yellow car parked in the driveway of a nearby abandoned house and drive away. A yellow Dodge was registered to Mendes. Jaye Wilson, who observed the chase itself, made a photographic identification of Mendes and a tentative in-court identification which she later defined as "80 to 90 percent" certain. Walter DeGrouchy narrowed a photographic array down to two persons, including Mendes, but could not make an in-court identification. Jean Battle averred that immediately after the shots she observed a man, whom she identified both in a photographic array and in court as Mendes, walk toward the yellow car parked near the scene of the crime. Richard Desmarais, unable to select a frontal photograph of Mendes's face, did select a profile phot of Mendes as the man he observed drive by his house, near the crime scene, shortly after he heard a series of "fire cracker" noises.

> Assistant United States Attorney Barry Coburn, the prosecutor assigned to handle the cocaine charges against Mendes, testified that Diggs was a confidential informant. The charges against Mendes were severed into two separate cases. One case involved alleged sales of cocaine by Mendes to Diggs on September 17, November 13, and December 30, 1986. The severed count involved an alleged sale by Mendes that Diggs "set up" to undercover drug enforcement agents on July 27,

---

[3]The victim is referred to as both David Diggs and Davide Diggs throughout the state court record.

1987.  The case involving Diggs directly had a trial date of June 16, 1988, which was the day after the homicide.

A search of Mendes's home resulted in the seizure of a small number of .38 and .22 caliber cartridges.  None of the seized ammunition matched the single .38 caliber bullet recovered from the body of Diggs, although expert testimony indicated the .38 cartridges seized in the search could have been fired from the same weapon. No firearm was recovered from Mendes's home.  Evidence was adduced, however, that at the time of his arrest on another charge Mendes possessed a loaded .22 caliber handgun.

Mendes's sons testified that at the time of the offense Mendes was settling a dispute between them over which would ride a moped to school; Mendes, resolving the issue, drove the boys to school himself.  James Enos-Edu placed Mendes in an automobile in the intersection of Burke and Burke Lake Roads in Burke, Virginia, at 7:45 a.m.  Mendes, in a statement to police, denied committing the offense and stated that during that morning he picked up damaged cans of food for the poor at two Giant Food stores, checked on tires under repair and the possibility of a job for his son at a tire store.

Rochelle Snyder, a long-time acquaintance and former girlfriend of Diggs, testified that Diggs was a drug dealer and was in debt to a pimp and drug dealer nicknamed Goldfinger. Snyder admitted to a criminal record for theft and forgery. As recently as the night before the homicide, Snyder said Diggs told her he was scared that Goldfinger was going to kill him because of the debt.

_____

[1]Prior to his arrest, Mendes practiced criminal law in the Superior Court for Washington, D.C.

(Paper No. 19, Ex. 16 at pp. 1-4).

After conclusion of the case and deliberation by the jury, Petitioner was convicted of first degree  murder and use of a handgun in the commission of a crime of violence.  *(Id.,* Ex. 12 at p. 199.)  Petitioner was sentenced on December 7, 1989, to life imprisonment without the possibility of parole for the murder and a concurrent term of 15 years for the handgun offense. (*Id.*, Ex. 13 at p. 24).

On appeal, Petitioner raised six claims:

1.      Is Petitioner entitled to reversal as a result of his absence from bench conferences during the selection of the jury;

2.      Did the trial court err in refusing to permit Petitioner to impeach his own witness, or alternatively to adduce evidence of statements admissible as declarations against penal interest;

3.      Did the trial court err in admitting improper rebuttal evidence;

4.      Did the trial court err in excluding the extrajudicial statements of an asserted alternative suspect;

5.      Did the trial court commit plain error in its instructions to the jury; and

6.      Did the trial court err in admitting irrelevant and prejudicial evidence.

(*Id.,* Ex. 14 at p. 2).  Petitioner's convictions were upheld in an unreported opinion by the Maryland Court of Special Appeals.  (*Id.,* Ex. 16).  The Court of Appeals of Maryland denied Petitioner's request for a writ of certiorari. *(Id.,* Ex. 19).  In his petition for certiorari, Petitioner raised two issues: (1) whether the trial court erred in refusing to permit Petitioner to impeach his own witness; and (2) whether the trial court erred in admitting improper rebuttal evidence. (*Id.*, Ex. 17).

In original and amended petitions, Petitioner sought post conviction relief in the Anne Arundel County Circuit Court.  (*Id.*, Ex. 20-22).  The post conviction court characterized the issues raised and not abandoned by Petitioner as follows:

1.      Whether trial counsel was ineffective in failing to present evidence during the suppression hearing to show that the pretrial photo arrays were both: (a) unnecessarily and impermissibly suggestive; and (b) unreliable;

2.      Whether trial counsel was ineffective by failing to demand a mistrial and/or in the alternative request a curative instruction when Petitioner was led into the courtroom by the Sheriff's deputies on August 28, 1989, in plain view of the jury, in leg irons, shackles and chains;

3

3.    Whether trial counsel was ineffective by failing to call Frederick Hawkins as a defense witness to rebut the testimony of Madeline Stokes, notwithstanding trial counsel's prior knowledge that the testimony of Hawkins may have negated criminal agency and possibly exonerated Petitioner, or, in the alternative, created reasonable doubt as to Petitioner's participation in the death of David Diggs;

4.    Whether trial counsel presented an apparent alibi defense witness for and on behalf of Petitioner without any investigation as to the accuracy and/or reliability of said witness testimony; and

5.    Whether in view of all of the circumstances, the cumulative effect of trial counsel's performance resulted in the denial of effective assistance of counsel to Petitioner.

(*Id.*, Ex. 29 at p. 2).  On May 23, 2002,  the post conviction court denied the petition for post conviction relief. *(Id.)*

Petitioner filed an application for leave to appeal the post conviction court's ruling. (*Id.,* Ex. 30 and 31). The Maryland Court of Special Appeals agreed to consider the case.  On appeal, Petitioner presented the following five questions:

1.    Whether the post-conviction court erred in concluding that trial counsel did not provide constitutionally ineffective assistance at the suppression hearing;

2.    Whether the post-conviction court erred in concluding that trial counsel did not provide constitutionally ineffective assistance by failing to call an essential defense witness (Frederick Hawkins);

3.    Whether the post-conviction court erred in concluding that trial counsel did not provide constitutionally ineffective assistance in failing to properly investigate an alibi witness before presenting the witness to the jury;

4.    Whether the post-conviction court erred in concluding that trial counsel did not provide constitutionally ineffective assistance in regard to Petitioner's appearance before the jury in leg irons, shackles and chains; and

5.    Whether the post-conviction court erred in concluding that the cumulative effect of all the errors by trial counsel did not collectively prejudice Petitioner sufficient to deny him constitutionally effective assistance.

(*Id.*, Ex. 32 at pp. 2-3).  In a reported opinion filed September 3, 2002, the Maryland Court of Special Appeals affirmed the post conviction court's denial of relief to Petitioner. (*Id.*, Ex. 35).

Petitioner sought review in the Maryland Court of Appeals, presenting the following questions:

1. Whether the Court of Special Appeals erred in concluding that trial counsel did not provide constitutionally effective assistance of [counsel] at the suppression hearing;

2. Whether the Court of Special Appeals erred in concluding that trial counsel did not provide constitutionally effective assistance of counsel by failing to call an essential defense witness;

3. Whether the Court of Special Appeals erred in concluding that trial counsel provided constitutionally effective assistance of counsel in failing to properly investigate an alibi witness before presenting the witness to the jury;

4. Whether the Court of Special Appeals erred in concluding that counsel provided constitutionally effective assistance in regard to appellant's appearance before the jury [in] leg irons, shackles, handcuff, chains and lock box; and

5. Whether the Court of Special Appeals erred in concluding that the cumulative effect of all of the errors by trial counsel collectively denied him constitutionally effective assistance of counsel.

(*Id.*, Ex. 36 at pp. 1-20). On December 12, 2002, the Maryland Court of Appeals issued an order declining to issue a writ of certiorari in Petitioner's case. (*Id.*, Ex. 37).

In this habeas corpus action, his first in federal court, Petitioner asserts the following claims:

(1) Counsel rendered ineffective assistance:

    (a) during the suppression hearing regarding pretrial identifications;
    (b) by failing to request a mistrial or, alternatively, a curative instruction when Mendes appeared before the jury in leg irons, handcuffs, and shackles;
    (c) by failing to call a witness who would have rebutted testimony from the victim's mother; and
    (d) by presenting an alibi witness without investigating the accuracy and reliability of said witness;

(2) The trial court erred by:

(a)     admitting improper rebuttal evidence;

(b)     not having Petitioner  present at bench conferences during jury selection;

(c)     not allowing Petitioner to impeach a defense witness;

(d)     excluding extrajudicial statements of an alternate suspect;

(e)     improperly instructing the jury; and

(f)     admitting irrelevant and prejudicial evidence.

(3)     The cumulative effect of all the errors resulted in the denial of effective assistance of counsel.

(Paper Nos. 1 and 5).

## II. Threshold Considerations

### A.  Exhaustion of State Remedies

Under *Rose v. Lundy*, 455 U.S. 509 (1982), before a petitioner may seek habeas relief in federal court, he is required to exhaust each claim presented to the federal court by pursuing all available remedies available in state court.    This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim.  *See* 28 U.S.C. § 2254(b) and (c).  In Maryland, this may be accomplished by proceeding with certain claims on direct appeal to the Court of Special Appeals (and thereafter seeking *certiorari* to the Court of Appeals) and with other claims by way of  a post-conviction petition, followed by seeking leave to appeal from the Court of Special Appeals.  Petitioner no longer has direct appeal or post-conviction remedies available in connection with the claims raised before this court, and thus he has exhausted the claims presented here.

### B. Statute of Limitations

There is no contention that the Petition is time-barred pursuant to 28 U.S.C. §2244(d).

**C.  Procedural Default**

In their Answer, Respondents assert that Petitioner is procedurally defaulted from asserting his claim regarding his absence from the bench conferences during jury selection and his claim that the trial court erred in excluding extrajudicial statements of another suspect. Respondents also assert that Petitioner is procedurally defaulted from asserting his claims regarding the trial court's instructions to the jury concerning (a) the role of the judge in jury trials and (b) identification by a single eye witness.  Lastly, Respondents contend that Petitioner is procedurally defaulted from asserting his claim that the trial court erred in admitting irrelevant prejudicial evidence regarding Petitioner's possession of narcotics and a .22 caliber revolver at the time of his arrest. (Paper No. 19).

The procedural default doctrine ensures that "state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding." *Picard v. Connor*, 404 U.S. 270, 276 (1971).  In *Wainwright v. Sykes*, 433 U.S. 72 (1977), the Court held that consideration of a claim in a petition for habeas corpus can be barred by failure to comply with state procedural rules, unless the petitioner makes a showing of cause for the failure and prejudice resulting therefrom. Thus, claims which have never been presented in the state courts--or claims which were not exhausted properly in the state courts--are procedurally defaulted if presentation of the claims in state court would be barred by state procedural rules.  *See Collier v. Jones*, 910 F.2d 770 (11th Cir. 1990). This procedural bar applies when the state court has found procedural default regardless of whether it has also discussed the merits, as long as the court has explicitly invoked the state

procedural rule as the basis for its decision. *See Harris v. Reed*, 489 U.S. 255, 264, n.10 (1989); *Ahe v. Styles*, 39 F.3d 80 (4th Cir. 1994).[4]

The court agrees with Respondents that Petitioner's claims regarding: (1) his absence from bench conferences during jury selection; (2) the trial court's exclusion of extrajudicial statements of another suspect; (3) jury instructions; and (4) admission of irrelevant and prejudicial evidence have been procedurally defaulted.

Petitioner's claim regarding not being present at bench conferences was addressed on direct review. The Maryland Court of Special Appeals, after citing relevant Maryland law detailing Petitioner's right to be present at bench conferences and demonstrating that such right is subject to waiver, found that Petitioner had waived his right to be present: "In the present case, there was a waiver. As set out above, the inaction of counsel constituted a waiver of appellant's right to be present at the bench conferences. Moreover, arguably, appellant's failure to object to not being present at the earlier conference when informed of his right to do so expressly waived any claim to be present." (Paper No. 19, Ex. 16 at 7). Additionally, Petitioner failed to raise this claim before the Maryland Court of Appeals. (*Id.*, Ex. 17).

As to Petitioner's claim that the trial court erred in excluding extrajudicial statements of another suspect, the Court of Special Appeals on direct appeal found that "The issue is not preserved for review because counsel made no proffer of why the evidence was admissible." (*Id.*, Ex. 16, at pp. 4-5). Moreover, Petitioner did not raise this claim when seeking certiorari to the Maryland Court of Appeals. (*Id.*, Ex. 17).

---

[4]The *Harris* Court emphasized that a federal court has the responsibility to determine whether a state court in fact based its denial of relief on procedural grounds.

8

In rejecting Petitioner's claims regarding jury instructions, the Court of Special Appeals on direct appeal found this issue had been waived, stating: "Appellant complains of three different instructions for the first time on appeal.  Objections to jury instructions are properly made before the jury begins deliberation.  Since no objection was raised, we decline to address the issue and find no error." (*Id.*, Ex. 16, at 15-16) (citations omitted).

The Court of Special Appeals also found that Petitioner's claim of trial court error based on admission of irrelevant evidence had not been preserved:  "The question appellant now presents about the evidence of the .22 caliber weapon is not preserved for appeal.  The defense neither objected to the evidence when it was presented nor did it ask the court for any remedial measures.  Rule 4-323." (*Id.*, Ex. 16, at pp. 16-17).   As with the other defaulted issues,  Petitioner also failed to raise this claim when seeking further review before the Maryland Court of Appeals. (*Id.*, Ex. 17).

Even where a claim has been procedurally defaulted,  this court must still consider whether it should reach the merits of the defaulted claim in order to prevent a fundamental miscarriage of justice.  *See Schlup v. Delo*, 513 U.S. 298 (1995).  The miscarriage of justice standard is directly linked to innocence.  *Id.* at 320.  Innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted.  *Id.* at 314.  The miscarriage of justice exception applies where a petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*,  477 U.S. 478, 496 (1986); *Schlup*, *supra*.  To meet this standard a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *See Schlup*, 513 U.S. at 327.

*Schlup* observes that

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare . . . To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial.

*Id*. at 323.

On June 20, 2003, the court entered an Order affording Petitioner an opportunity to demonstrate the existence of cause for his failure to raise his claims in the state courts properly and prejudice resulting from this failure. (Paper No. 21). In response, Petitioner essentially repeats his claims and points out contradictions in the evidence adduced at trial as demonstrating his innocence. Petitioner also states that the Public Defender's Office refused to represent him on appeal and that it was not until the Anti-Terrorism and Effective Death Penalty Act of 1996 ["AEDPA"] 28 U.S.C. §§ 2244-66 AEDPA was enacted that the importance of presenting all claims on appeal became evident. (Paper No. 29). These arguments are unpersuasive. Petitioner has failed to make the requisite showing. He has presented no evidence, nor suggested that any exists, which could satisfy the difficult standard set forth in *Schlup*. Petitioner's procedurally defaulted claims are therefore foreclosed from federal habeas review.

### III.  Standard for § 2254 Review

Because this Petition was filed after April 24, 1996, it is to be decided under amendments to the habeas corpus statutes contained in the AEDPA. *See Woodford v. Garceau*, 538 U.S. 202, 207 (2003); *Beck v. Angelone*, 261 F.3d 377, 380 n.3 (4th Cir. 2001). AEDPA modified the federal court's role in habeas proceedings in order to prevent federal "retrials" and to ensure that state court convictions are given effect to the extent possible under law. *See Bell v. Cone*, 535 U.S. 685, 693

(2002).  Pursuant to statute, a federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:

> 1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> 2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), "which demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curium*).  In *Williams v. Taylor*, 529 U.S. 362 (2000), Justice O'Connor explained that a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Id*. at 412-413.  A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court  identifies the correct  governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*.  "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id*. at 409-410; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Booth-el v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002).

Further, federal courts must give great deference to a state court's factual findings.  *See Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  Section 2254(e)(1) provides that a determination of

11

a factual issue made by a state court shall be presumed to be correct absent clear and convincing evidence to the contrary.   The applicant has the burden of rebutting the presumption of correctness. A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.   *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

With these standards in mind, the court will address the merits of Petitioner's claims.

**A.      Petitioner's Sixth Amendment Claims**

To establish a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), a convicted defendant must demonstrate that his counsel's performance (1) "fell below an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defendant.  *Id*. at 688, 692.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686.  The ultimate focus of the *Strickland* inquiry is on the "fundamental fairness of the proceeding whose result is being challenged." *Id*. at 696.

In evaluating whether counsel's performance fell below an objective standard of reasonableness, a court must consider "whether counsel's assistance was reasonable considering all the circumstances." *Id*. at 688.   In its analysis, a court must be "highly deferential," and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (internal

quotations omitted).   A court must not use the benefit of hindsight to second-guess strategic decisions made by counsel unless they were unreasonable.  *Id*. at 690.

With regard to the prejudice prong of *Strickland*, a defendant need not demonstrate that the outcome of the proceeding would have been different, but rather that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  Even if counsel committed a professionally unreasonable error, relief can be granted only if "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  *See Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

1.      **Suppression Hearing**

Petitioner contends that he was denied the effective assistance of counsel during the pretrial suppression hearing.  In reviewing this claim the Maryland Court of Special Appeals recounted the facts surrounding the compilation of photo arrays containing Petitioner's photograph, the viewing of those arrays by various witnesses, and Petitioner's objections to the photo arrays.  The Court of Special Appeals stated as follows:

> One day after the shooting, Detective Dirk Rinehart of the Anne Arundel County Police Department prepared a photo array ("the first array") depicting six persons, which he showed to several witnesses. This first array, comprised of black and white frontal and profile shots of each of the six persons, included year-old photos of appellant that the detective had obtained from another police department. Following appellant's arrest, Detective Rinehart took a new photo of appellant and included it in a second photo array ("the second array"), which was comprised of color, frontal shots of six persons. The second array was shown to various witnesses as well.[1]
>
> Prior to trial, appellant moved to suppress evidence that several witnesses had selected appellant's photo from one or both of the arrays as someone they had seen at or near the crime scene. A hearing was held, and defense counsel argued that the identification procedure was suggestive in that: only six photos were used in each

array; the complexions and ages of the persons in the arrays were dissimilar; the photo of appellant used in the first array was printed on newer paper than the other photos; the photo of appellant used in the second array had been published previously in a local newspaper and had been seen by at least some of the witnesses; and the photo of appellant used in the second array was "more distinctive" in color than the other photos.  The court denied the motion.

In petitioning for post-conviction relief, appellant posited that the police had shown both photo arrays to four of five witnesses whose trial testimony, with varying degrees of certainty, placed appellant at the crime scene.  Appellant contended that his trial counsel's assistance was ineffective in that counsel failed to argue that the identification procedure was suggestive or impermissibly suggestive in that (1) appellant was the only person depicted in both photo arrays, and (2) several witnesses saw only partial views of the suspect, and all the photos in the arrays "did not match the views the witness[es] allegedly had."  Appellant further argued that counsel was ineffective in failing to argue that the identifications made by the witnesses were unreliable.

(Paper No. 19, Ex. 35 at pp. 6-8)

The Court of Special Appeals then correctly summarized Maryland law as it applied controlling Supreme Court precedent concerning when the Due Process Clause of the Fourteenth Amendment compels exclusion of pre-trial identification. (*Id.* at pp. 9-11).  In turning to Petitioner's argument that an extra-judicial identification that is permissibly suggestive is admissible only if reliable, the Court of Special Appeals held, in pertinent part:

While the Court has not expressly modified the language, it has implicitly suggested that the reliability of an extra-judicial identification procedure is not placed in issue unless the procedure was impermissibly or unnecessarily suggestive.  In *Jones v. State*, 310 Md. 569, 577 (1987), *vacated and remanded on other grounds*, 486 U.S. 1050 (1988), the Court seemed to use the terms "suggestive" and "impermissibly suggestive" interchangeably.  The Court explained:

In *Webster*, we reviewed the law pertaining to suggestive pretrial identifications, noting that the cases establish a two-stage inquiry for due process challenges to extrajudicial identification....The First question is whether the identification procedure was impermissibly suggestive...If the out-of-court identification was not made under suggestive circumstances, the due process inquiry ends: both judicial and extrajudicial identification evidence is admissible....

14

If, on the other hand, the identification was tainted by suggestiveness the inquiry progresses to the second stage.

*Jones,* 310 Md. at 577.

(Paper No. 19, Ex. 35 at pp. 11-12).

The court then summarized Maryland and federal case law establishing a two-stage inquiry for due process challenges to extrajudicial identifications. (*Id.* at pp. 12-17).   Turning next to the facts surrounding the extrajudicial identifications of Petitioner, the court concluded that the identifications were not suggestive.

> The post-conviction court's opinion was based on tacit acceptance of appellant's assertion that four of the five witnesses were either unable to identify appellant or made only tentative identifications after viewing the first array; after viewing the second array, their identifications "became more positive."  Our review of the hearing on the motion to suppress convinces us, however, that this acceptance was clearly erroneous.  Detective Rinehart, the sole witness at the hearing, simply did not testify that four witnesses viewed both arrays.  He indicated only that one witness, whom he did not name, saw both arrays.  According to Rinehart, that witness reported that he had seen the suspect only from the side.  The witness was nevertheless shown photos with only frontal views.  When the witness was unable to make an identification, he was shown the first array, which included side views. Detective Rinehart's testimony regarding the presentation of photo arrays to the other witnesses was either vague or nonexistent.

****

> [T]he trial transcript reflects that two of the five witnesses–Jay Wilson and Jean Battle–made positive identifications of Appellant after viewing only one array and apparently were not shown a second array.  A third witness, Walter DeGrouchy, testified that he was shown one array and that he selected photos of appellant and one other person as resembling the assailant.   There was no indication that DeGrouchy was ever shown another array.  At trial, DeGrouchy stated that appellant looked like the person he saw at the crime scene, but added, "I honestly can't be totally positive."  Witness Leslie Spicer testified that the police never showed him any photos, but that he called the police after seeing a photo of appellant in a newspaper and stated that the photo resembled the man he saw at the crime scene. Finally, Richard Desmarais–apparently the witness to whom detective Rinehart referred at the suppression hearing–testified that he was shown "frontal pictures" a few days after the shooting but could not identify anyone because he had only seen

15

the suspect's profile.[7] Almost a year later, Desmarais was shown the second array, which consisted of frontal photos, but again could not make an identification. Desmarais asked the police to show him side-view photos, and the police then showed him the first array.  Desmarais selected appellant's photo from that array.

Were we, like the post-conviction court, to accept appellant's assertion that four of the five witnesses viewed both arrays, we would agree with the post-conviction court's conclusion that the argument that the identification procedure was suggestive for that reason would not have swayed the trial court.  Thus, we would agree with the post-conviction court that under the circumstances the trial court was not required to assess the reliability of the identification.[8]  "While we can readily envisage a case in which the multiple inclusion of a suspect's photograph among a group of photographs shown to an identifying witness may be so emphasized or highlighted as to constitute a denial of due process..., we think each case must necessarily be judged on it its own facts."  *Thompson v. State*, 6 Md.App. 50, 53 (1969) (no error in admitting photographic identification of the defendant where the police showed witnesses three different photos of the defendant in a group of approximately 50 photos).  *See also Simmons*, 390 U.S. at 383-84 (declining to conclude that a trial court erred in admitting identifications of the defendant where the witnesses viewed group photos in which the defendant appeared several times, and explaining that the danger of misidentification increases if the police show a witness "pictures of several persons among which the photograph of a single...individual recurs several times or is in some way emphasized," but that each case must be considered on its own facts....").

The trial court had before it all of the photos from both arrays.  As the post conviction court observed, the trial court unequivocally determined at the hearing on the motion to suppress that the photo arrays were not in any way suggestive.  As we have indicated, the transcripts of the hearing on the motion to suppress and the subsequent trial indicate that the first array contained black and white frontal photos and profile shots of each person.  The second array contained color, frontal photos. The photos of appellant in the first array were a year older than the photo in the second array.  Our own, unassisted review of the transcript reveals testimony that appellant's appearance had not changed dramatically in that year.  Appellant directs us to nothing in the record, however, that would establish that his appearance was identical in the two photos.  Given the obvious differences in the arrays, and the fact that the trial court viewed them and stated that there was "nothing suggestive" about them, we are not persuaded that the court would have or should have altered its view had trial counsel made the argument in question.

Appellant directs us to nothing in the record that would confirm that he complained to the post-conviction court of trial counsel's failure to argue that the first array was suggestive in that it contained left-side profile shots of only three of the six suspects.  Assuming, without deciding, that this argument was made to the

post-conviction court and is properly before this Court, we conclude that the post-conviction court properly rejected it.

It is apparent from the transcripts of the hearing on the motion to suppress and the trial that the first array included two photos of each of the six persons depicted: one frontal shot and one profile shot. Three of the profile shots, including appellant's, were taken from the left side. The other three were taken from the right side. Richard Desmarais testified to the effect that he had seen the suspect from the left side. Appellant directs us to nothing however, that would indicate that any of the other witnesses specified the precise angle from which they viewed the suspect. Appellant's argument suggests that, in compiling a photo array, the police should be required to use photos that depict each person from each angle that each witness viewed the suspect. Clearly, such a requirement would render impossible the compilation of an acceptable photo array.

_____

[7]Desmaris was apparently shown photos from the first array. We glean no explanation from the record as to why he was not shown the profile shots at the time.

[8]It is significant to note that, despite the post-conviction court's statement that appellant "correctly contends that counsel failed to argue that the State's witness were unreliable thereby foreclosing the [trial] court's ability to suppress the array," the record of the suppression hearing reflects that trial counsel did attempt to make such an argument. Toward the close of the hearing, the prosecutor argued to the effect that, even if the court deemed the photo identification procedure to be impermissibly suggestive, there was no reason to believe it was unreliable. Defense counsel responded;

> With respect to the *Manson* factors [regarding reliability], Your Honor, I certainly would have gone into all of those factors which is a haven for Defense lawyers. But when I asked with respect to the first identification witness what the witness said [the prosecutor] objected, and the Court sustained that, and I didn't want to violate the Court's order. If the Court's position is that I can delve into those factors, then I would ask to recall Detective Rinehart. I think the Court has enough before it to conclude–
> THE COURT: Yeah
> [DEFENSE COUNSEL]:–with respect to the newspaper issue what it–what the Court's going to decide.

The court thus indicated to defense counsel that the presentation of evidence as to reliability would be futile.

(*Id.*, Ex. 35 at pp. 17-22).

The Due Process Clause protects against identification procedures which are unnecessarily suggestive and which are conducive to irreparably mistaken identifications. *See Neil v. Biggers*, 409 U.S. 188, 196 (1972) (citing *Stovall v. Dennis*, 388 U. S. 293, 301-302 (1967). The defendant has the initial burden of showing that the procedure was unnecessarily suggestive. If he meets this burden, the court then determines if the identification was nevertheless reliable under the totality of the circumstances. *See Manson v. Brathwaite*, 432 U. S. 98, 114 (1977). These standards apply to photo arrays as well as line ups and in-court identifications. *See Simmons v. United States*, 390 U. S. 377, 384 (1968).

Even assuming that the identification procedure was suggestive, the court may admit the identification based upon the reliability of the identification. *See United States v. Dorta*, 783 F.2d 1179 (4th Cir. 1986) (identification reliable even if pretrial photo display was impermissibly suggestive when witness had several previous encounters with suspect). In determining the reliability of identification under the totality of circumstances, courts apply a balancing test, weighing the corrupting effect of suggestive procedures against indicia of reliability. *See Manson*, 432 U.S. at 114; *Biggers*, 409 U.S. at 199-200; *see United States v. Wilkerson*, 84 F.3d 692 (4th Cir. 1996) (no plain error); *United States v. Johnson*, 732 F.2d 379 (4th Cir. 1984); *Willis v. Garrison*, 624 F.2d 491 (4th Cir. 1980). The Maryland Court of Special Appeals' rejection of Petitioner's claim was neither contrary to clearly established federal law, nor involved an unreasonable application of that law. Moreover, the state court's recitation of the facts surrounding the extrajudicial identification of Petitioner is supported by the record before this court. Accordingly, the state court's decision shall not be disturbed.

## 2.    Appearance Before the Jury in Leg Irons and Other Restraints

18

Petitioner complains that the jury was permitted to see him in restraints during the trial.

This, he believes, unduly prejudiced the jury against him  As to this claim, the Maryland Court of

Special Appeals held as follows:

> At the start of the sixth day of trial, as appellant stood up when the judge entered the courtroom, defense counsel noticed that appellant was wearing restraints.[10]  Appellant apparently had been led into the courtroom after the jury was impaneled and had been wearing the restraints at that time.  Defense counsel approached the bench, leaving appellant at the trial table, and told the court:

>> [H]e's got leg irons on right now in front of the jury.  Can you believe this?...They come in here and put chains on him.  I mean, this is outrageous.

> Defense counsel added: "I didn't see it until he stood up just [now].]" Counsel made several more statements to the court which are reflected as "inaudible" in the trial transcript.  The court cautioned counsel to "[j]ust calm down."

> The court then excused the jury and directed the deputy sheriff to "take the leg irons off."  The court instructed the deputy sheriff: "Never bring a man in here standing trial with either handcuffs or leg irons again."  The jury was then recalled. The trial record does not reflect what transpired at that time, but former juror Stephen McCoy testified at the post-conviction hearing that when the jurors re-entered the courtroom the court instructed them that "Mr. Mendes has been brought in shackles and to disregard that..." The trial then resumed.

> In *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986), the Supreme Court observed that an "inherently prejudicial practice... like shackling should be permitted only where justified by an essential state interest specific to each trial."

> ****

> Appellant argued at the post-conviction hearing that trial counsel was ineffective in failing to move for a mistrial or to request a curative instruction. The post-conviction court accepted the State's evidence that a curative instructions had in fact been given, although the instruction was not reflected in the trial record.  The court rejected appellant's argument that trial counsel was ineffective and reasoned:

>> The minimal, if any, prejudice caused to Mr. Mendes by his brief appearance before the jury in shackles would not warrant a mistrial had one been requested.  Therefore, the court finds that trial counsel was not ineffective by not requesting a mistrial and because the trial judge delivered a curative

19

instruction the court finds that any minimal prejudice that may have occurred, was cured.

The court added that, even without a curative instruction, any prejudice would have been "*de minimis.*"

Appellant argues on appeal that the post-conviction court miscalculated the amount of time that he spent in restraints before the jury. For that reason, he argues, the court underestimated the amount of prejudice he suffered and erred in determining that trial counsel was not ineffective. There is no dispute that no essential State interest justified the physical restraint of appellant before the jury.

****

The trial record reflects that only two minutes elapsed from the time the trial judge entered the courtroom to the time the jury was excused and appellant's restraints were removed. Appellant suggests that he was in the courtroom with the jurors for a significant period of time before the judge entered the courtroom; defense counsel noticed the restrains; and the matter was brought to the court's attention. McCoy , the former juror, testified at the post-conviction hearing, however, that trial counsel approached the bench regarding the restraints "immediately" upon appellant's entrance into the courtroom. Appellant has failed to meet his burden of establishing a reasonable probability that a mistrial would have been granted had trial counsel requested one.

---

[10]Appellant states on appeal that "[t]here is no question that the jury viewed Appellant in leg irons, shackles, and chains." Although both appellant and a former juror, Stephen McCoy, testified at the post-conviction hearing that Appellant was also wearing handcuffs, appellant makes no mention of the handcuffs in his brief. There is no mention in the pertinent portion of the trial record of appellant wearing handcuffs.

(Paper No. 19, Ex. 35 at pp. 30-33).

In *Holbrook*, the Supreme Court made it clear that the role of a reviewing court is to "look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." *Holbrook,* 475 U.S. at 572.

Plaintiff has failed to carry his burden. He has failed to demonstrate that his brief appearance before

the jury in restraints, in light of the prompt remedial actions taken by the trial judge, was so inherently prejudicial that it threatened his right to a fair trial. *Id.* The trial judge took immediate action to have the restraints removed before any court proceedings took place. Thus, he was not in restraints *during* any portion of the trial.[5]

This court is mindful that there are discrepancies in the record regarding Petitioner's appearance in restraints. The trial transcripts do not demonstrate that a curative instruction was given after defense counsel alerted the trial court to Petitioner's wearing restraints. However, as noted above, a juror testified at the post conviction hearing that he recalled both the Petitioner appearing in restraints and the jurors being instructed by the court to disregard same. Additionally, portions of the trial transcript detailing defense counsel's colloquy with the court concerning Petitioner's appearance in restraints are reported as inaudible. There is also some dispute as to the length of time Petitioner appeared before the jury in restraints. Petitioner contends that he was escorted into the courtroom after the jury was seated and waited several minutes before the judge took the bench. The juror who testified regarding the events recalls that immediately upon Petitioner's entering the courtroom the defense attorney brought the matter to the court's attention. Likewise, the record is unclear as to the type of restraints placed on Petitioner. Various portions of the record refer to Petitioner being restrained by either handcuffs, shackles, a lock box, chain or some combination of the four. Notwithstanding the foregoing discrepancies, the factual

---

[5] The recent Supreme Court decision in *Deck v. Missouri*, 125 S.Ct. 2007, 2015 (2005)(shackling is inherently prejudicial), does not apply retroactively to this case on collateral review. *Marquard v. Secretary for Dept. of Corrections*, 429 F.3d 1278, 1311 (11th Cir. 2005) (*Deck* establishes a new rule that does not apply retroactively to Marquard's § 2254 petition.) Moreover, Petitioner here was not compelled to stand trial while in restraints; rather he briefly appeared in shackles before proceedings began on one morning.

determinations by the post conviction court that Petitioner appeared only briefly before the jury in restraints and that a curative instruction was given, find support in the record.  Moreover, Petitioner has failed to rebut these factual findings.  *See* 28 U.S.C. Section 2254(e)(1) Additionally, the state courts' determination that any prejudice, even without a curative instruction, was *de miminis* is not an unreasonable application of *Holbrook.*

**3.       Failure to Call Witness to Rebut Testimony of Victim's Mother**

Plaintiff alleges that trial counsel's failure to call Frederick Hawkins to rebut the testimony of the victim's mother that the victim told her that Petitioner was the shooter constituted ineffective assistance of counsel.  The Maryland Court of Special Appeals thoroughly reviewed this claim and held:

> Hawkins resided across the street from the house where the victim lived with his mother and his son.  Hawkins testified at the post-conviction hearing that on the morning of the shooting he was walking out his front door when he heard gunshots.  Hawkins then saw two men running in the victim's yard.  His testimony proceeded as follows:
>
> A       And [Davide] hollered out, "Momma, I've been shot," and right after he said that he collapsed.
>
> Q       [defense counsel] What if anything did Madeline Stokes [do] at that time when [Davide] collapsed, if you know?
>
> A       Okay. Madeline started toward [Davide]. Well, she said, after he had hollered, "Momma, I've been shot," she said, "Well, who shot you?" And–
>
> Q       And did [Davide] respond?
>
> A       No he did not.  He collapsed and then he got up again and he ran maybe another 10 or 15 feet and collapsed again.
>
> The post conviction court rejected appellant's argument that Hawkins' testimony would have contradicted the testimony of Madeline Stokes that the victim had identified appellant.  The court reasoned:
>
> > Because of the gaps in Mr. Hawkins' ability to hear all of the dialogue that potentially could have taken place between the victim and Mrs. Stokes, the Court is not convinced that Mr. Hawkins, had he testified at the

trial, would have introduced a reasonable doubt as to Mr. Mendes' involvement in the death of Mr. Diggs.   To establish prejudice from counsel's failure to investigate a potential witness, a petitioner must show that the witness would have testified and that their testimony "would have probably changed the outcome of the trial."   *See State v. Nix*, 31 F.3d 741, 744 (8th Cir. 1994).   Therefore, trial counsel's failure to call Mr. Hawkins did not prejudice petitioner's cause and would likely not have resulted in a different conclusion had Mr. Hawkins testified.

Appellant now contends that, in reaching this conclusion, the post-conviction court misapplied the test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668, 686 (1984).   Appellant complains that the court failed to examine the first part of the test–whether counsel's' representation fell below an objective standard of reasonableness–and focused only on the second prong of the test–"the prejudice arising out of counsel's error."   Appellant further asserts that the court applied an "erroneous standard" in examining the second prong, looking to whether Hawkins' testimony would have created a "reasonable doubt" as to appellant's involvement in the crime rather than to whether "there was a substantial possibility that Mr. Hawkins' testimony would have resulted in a different outcome...."

Preliminarily, we reiterate that "we need not find deficiency of counsel in order to dispose of a claim [of ineffective assistance of counsel] on the grounds of lack of prejudice." *Cirincione v. State*, 199 Md. App. 471, 485-86, (1998).   The post-conviction court was not required to determine whether trial counsel's failure to call Hawkins to the stand fell below an objective standard of reasonableness before determining whether appellant was prejudiced by the failure.

This Court has made clear that, under *Strickland*, a defendant will be deemed to have been prejudiced by errors of counsel only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Jones*, 138 Md.App. At 206 (citation omitted).   As the above-quoted portion of the post-conviction court's opinion makes clear, while the court referenced the "reasonable doubt" standard it *also* expressed its conclusion that Hawkins' testimony probably would not have altered the outcome of the trial.   Appellant's contention that the court applied the wrong standard is specious.

Our independent appraisal of the record convinces us, moreover, that the post-conviction court's determination was correct.   Hawkins indicated at the hearing that Stokes was moving toward the victim but had not yet reached him when Hawkins heard her ask the victim who had shot him and observed that the victim failed to respond.   Stokes testified at trial that it was not until she had reached the victim and was raising his shirt to see the bullet wounds that the colloquy took place.   Hawkins admitted that he was out of earshot at that point.   Hawkins' testimony that

the victim did not answer Stokes' question as Stokes was running toward the victim in no way contradicted Stokes' testimony that the victim answered her when she was standing over him.[9]

_____

[9]Interestingly, another witness, Jaye Wilson, testified at trial that *she* was present when Stokes was removing the victim's shirt, and that she did not hear the victim say a word.

(Paper No. 19, Ex. 35 at pp. 23-26).

This court agrees that there was no prejudicial error in failing to call Mr. Hawkins as a witness. Without a harmful or prejudicial result, the fact that counsel did not do more does not establish ineffective assistance to Petitioner. *See Horne v. Peyton*, 356 F.2d 631, 633 (4th Cir.1966). Petitioner has not offered any evidence that but for the alleged deficient performance of trial counsel, the result of the trial would have been different. The fact that counsel could have called Mr. Hawkins as a witness does not establish that the attorney's performance was outside the wide range of reasonably effective assistance, particularly in light of the fact that Mr. Hawkins testimony did not directly contradict the testimony concerning the victim's declaration and that the testimony was cumulative to that of Ms. Wilson. *See Burger v. Kemp*, 483 U.S. 776, 794-95 (1987). Accordingly, Petitioner's claim fails.

**4.     Failure to Investigate the Alibi Witness's Accuracy and Reliability**

Plaintiff alleges that he was denied the effective assistance of counsel when trial counsel presented an alibi witness to the jury without first investigating the accuracy and reliability of the witness's proposed testimony. The Court of Appeals in rejecting this claim stated:

> Defense counsel called appellant's 17-year old son, Fortunato Mendes, III, as an alibi witness. Appellant's son testified to the effect that, at the time of the shooting, appellant was driving him to school. When asked by defense counsel why

he remembered that particular morning, appellant's son responded: "I'm usually a little late, and my teacher noticed I was on time that day."

Thereafter, the State called the teacher in question as a rebuttal witness. The teacher told the court that on June 15, 1988, when the shooting occurred, she was in Nashville, Tennessee, escorting a student to the national forensic league speech finals.

Appellant argued to the post-conviction court that trial counsel should have investigated the alibi provided by Fortunato Mendes, III and thus uncovered the inconsistency. The court disagreed and in its "Memorandum Opinion and Order" explained:

> The court finds that the fact that trial counsel did not further investigate the witness's alibi does not demonstrate ineffective assistance. On the contrary, trial counsel may not have wanted to investigate the matter too closely for fear of disqualifying a potential alibi witness. Further, it is even questionable whether trial counsel would have necessarily discovered the specific comment stated by the son regarding his teacher remarking as to his punctuality because it is likely that the son added this potion of his testimony as an afterthought. For these reasons and because case law indicates that it was not unreasonable for trial counsel to not further investigate an alibi witness furnished by the defendant, the court finds that trial counsel was not ineffective by not further investigating the alibi witness's testimony prior to his testimony.

Appellant now asserts that there was no suggestion at the post-conviction hearing that trial counsel's failure to investigate the witness' story was a deliberate, tactical decision. He points out that counsel specifically stated at the hearing that it was *not* a tactical decision–he simply believed that appellant's son was credible and that further investigation was unnecessary. Appellant concludes that "[c]ounsel's failure to investigate at all resulted in the defendant's son being portrayed as a liar, who was attempting to cover up for appellant."

As appellant asserts, the post-conviction court's observation that counsel's failure to investigate could have been a tactical decision is belied by the record. The court correctly concluded, however, that counsels' failure did not amount to ineffective assistance. In making this determination, we are mindful of defense counsel's testimony at the post-conviction hearing that both appellant and appellant's wife provided him with the same alibi as did their son. As the post-conviction court observed, quoting *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994), "'the reasonableness of an attorney's investigation may critically depend on the information forwarded by the defendant and the defendant's own strategic decision about his representation.'"

25

The post-conviction court further recognized that in *Bassette v. Thompson*, 915 F.2d 932 (4th Cir. 1990), the United States Court of Appeals for the Fourth Circuit was presented with a factual scenario nearly identical to that in the case sub judice. In *Bassette*, the defendant's niece, a college student, testified at the defendant's murder trial that when the murder was committed the defendant was with her, visiting the defendant's grandmother. The witness stated that "she remembered the date because she had noted the visit in a journal she was keeping for a class she was attending at [a] Community College." *Id*. at 935. In rebuttal, the State called the niece's college instructor, who testified that the journal assignment was not given until long after the date of the murder, and that she had not even met the defendant's niece until five months after the murder occurred. *See id.* After his conviction, the defendant petitioned for writ of *habeas corpus* and argued, *inter alia*, that his counsel had rendered ineffective assistance by failing to investigate the alibi. The petition was denied. In affirming the lower court's decision, the Fourth Circuit Court of Appeals explained:

> Appellant claims ineffective assistance of counsel because his trial attorney failed to conduct a sufficient investigation of his alibi witness...so as to realize that she was lying in her testimony....
>
> This is not evidence of ineffective assistance of counsel, but is only evidence that Bassette introduced his attorney to a witness who was willing to lie under oath....The circumstances in this case reflect that appellant produced certain relatives and close acquaintances who would testify that he was with them on the night of the murder. The attorney's performance is not constitutionally defective in this instance because he did not go to the college and interview [the niece's] instructor in an effort to verify her testimony. There is no rule that counsel must disbelieve prospective witnesses presented to him by his client, or that he must spend considerable time and effort in testing the veracity of such witnesses or attempting to disprove their statements.

*Id.* at 939-40 (citation omitted).

In addition, as the post-conviction court observed, there was no indication that appellant's son mentioned his teacher's comment to counsel prior to trial. Until the witness stated on the stand that his teacher had commented that the witness was on time, appellant had no reason to believe that anyone would have noticed the witness' arrival at school that day. As we have indicated, the burden was on appellant–not on the State–to show that trial counsel's performance was deficient. *See Strickland*, 466 U.S. at 687.

(Paper No. 19, Ex. 35 at pp. 26-30).

The state court's recitation of the facts as adduced at trial and the post conviction hearing concerning the alibi testimony of Petitioner's son are supported by the record. The state court correctly applied *Strickland* in finding no error on the part of defense counsel in failing to question the veracity of the witness proffered by Petitioner.  Even assuming, *arguendo*, that counsel's failure to more fully investigate the testimony of the alibi witness was error, Petitioner has failed to demonstrate that such deficient performance rendered  "the result of the trial unreliable or the proceeding fundamentally unfair."  *See Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Accordingly, the state court's decision shall not be disturbed.  28 U.S.C. §2254(d) and (e).

**B.    Trial Court Error**

**1.    Improper Rebuttal Evidence**
**2.    Refusal to Permit the Defense to Impeach Its Witness**

Petitioner contends that the trial court erred in permitting  his son and alibi witness, Fortunato Mendes, III, to be called by the State as a rebuttal witness.        He also takes issue with the restrictions placed by the trial court on his ability to question his witness, Dawn Torres. Specifically Petitioner contends that the trial court erred in finding that defense counsel was prohibited from impeaching his own witness. The Maryland Court of Special Appeals agreed that the trial court erred in refusing to permit the re-examination of Dawn Torres based on the belief that the defense had vouched for the witness and therefore was prohibited under Maryland law from impeaching her, however the court found that the examination of Ms. Torres was properly limited due to the continued questioning of Ms. Torres being argumentative and irrelevant. (Paper No. 19, Ex. 15 at pp. 4-6). Petitioner also alleges that the trial court erred in prohibiting defense counsel from impeaching the witness with her prior inconsistent statements which defense counsel sought

to admit as an exception to the hearsay rule.  Again, the appellate court found sufficient basis for the trial court's denial of defense counsel's effort to introduce the evidence.  (*Id.* at pp. 6-9).

To the extent that Petitioner contends that court erred in its ruling as it pertains to Maryland law regarding the admission of evidence,  it is not the role of this court to second guess those conclusions.  *See Rose v. Hodges* 423 U.S. 19, 21– 22 (1975); s*ee Estelle v. McGuire*, 503 U.S. 62, 67-68 (1991)  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id*.   "Absent 'circumstances impugning fundamental fairness or infringing specific constitutional protections,' admissibility of evidence does not present a federal question."  *Gaskins v. McKellar*, 916 F.2d 941, 949-50 (4th Cir. 1990).  As Petitioner's arguments are based upon state law, they are not subject to review by this court.  *See Spencer v. Murray*, 18 F.3d 237, 239-40 (4th Cir. 1994); *Estelle v. McGuire* 502 U.S. 62 (1991).

## C.     Cumulative Effect of Errors.

Petitioner alleges that the cumulative effect of counsel's errors entitles him to habeas relief. This claim was addressed by the Maryland Court of Special Appeals as follows:

> This Court has explained that, in a post-conviction proceeding concerning the assistance of counsel,
>
> > even when no single aspect of the representation falls below the minimum...standards required under the Sixth Amendment, the cumulative effect of counsel's entire performance may still result in a denial of effective assistance....[T]his cumulative effect may be applied to either prong of the *Strickland* test.  That is, numerous non-deficient errors may cumulatively

amount to a deficiency,...or numerous non-prejudicial deficiencies may cumulatively cause prejudice.

*Cirincione*, 199 Md. App. at 506 (citations omitted).  *See also Bowers v. State*, 320 Md. 416, 436 (1990) ("Even when individual errors may not be sufficient to cross the threshold, their cumulative effect may be"); *Schmitt v. State*, 140 Md. App. 1, 46 ("in assessing the overall trial performance [of counsel]..., we will aggregate all the errors or lapses that may be found to have occurred"), *cert denied*, 367 Md. 88 (2001). Appellant thus argued to the post-conviction court, and argues to this Court, that even if the individual errors committed by trial counsel did not amount to ineffective assistance, "there is a substantial possibility that the outcome of Appellant's trial would have been different" but for the cumulative effect of the errors.

The post-conviction court rejected this argument and explained: "The court finds that the prejudice and/or error that may have occurred are minute nonexistent so as to render the cumulative nature of any error insignificant."  Appellant now contends that the court's reasoning was flawed in that, in appellant's view, "there is no dispute that errors did occur at trial and these errors did cause some prejudice...." We are not persuaded.

The post-conviction court did not mischaracterize the nature of counsel's "errors" or the prejudice to appellant.  As we have explained, despite the post-conviction court's tacit acceptance of appellant's allegation that two photo arrays containing appellant's photo were shown to four of the five witnesses who identified appellant as being present at the crime scene, the record reflects that only one witness was shown two arrays.  That witness indicated that he could not identify appellant from any photos showing frontal views; he specifically asked to see profile shots.  Appellant failed to establish, moreover, that there was a reasonable probability that the additional arguments regarding the suggestiveness of the identification procedure would have changed the outcome of the trial.  Likewise, appellant failed to establish that, had counsel called Frederick Hawkins to the stand, Hawkins' testimony would have contradicted Madeline Stokes' testimony that the victim identified appellant as the man who shot him.  Appellant did not establish that trial counsel was in any way derelict in failing to investigate the alibi provided by appellant's son–an alibi that, according to counsel, was confirmed by both appellant and his wife.  Finally, appellant failed to establish a reasonable probability that, if defense counsel had moved for a mistrial when appellant was brought into court in restraints, the motion would have been granted.

As the Court of Appeals, commented in rejecting a similar argument in *Gilliam v. State*, 331 Md. 651, 686 (1993), "This is not a case where the cumulative effect of numerous interrelated errors in aggregate amount to inadequate

29

representation.  This is more a case of the mathematical law that twenty times nothing is still nothing."  The petition for post-conviction relief was properly denied.

(Paper No. 19, Ex. 35 at pp. 34-36).

This court is in agreement.  Claims of ineffective assistance must be reviewed individually, not collectively.  *See Fisher v. Angelone***,** 163 F.3d 835, 852 (4th Cir. 1998). Petitioner contends that the foregoing allegations of error, considered cumulatively, were tantamount to a denial of a fair trial.  This claim does not warrant habeas relief.  Because none of the issues raised by Petitioner could be considered error, he cannot string them together in hopes of forming a constitutional violation.  *Id.*  at 852-53 (noting that with respect to claims of attorney error, like claims of trial court error, the cumulative-error analysis appraises only the effect of matters actually determined to be constitutional error and not the cumulative effect of all matters deemed deficient).

## IV. CONCLUSION

Upon review of each of Petitioner's claims, together with the exhibits provided by the State and Petitioner, it is clear that he cannot sustain the burden required by 28 U.S.C. § 2254(d).  The decisions of the state courts represent sound legal reasoning as well as a reasonable applications of well established law.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland*, 466 U.S. at 686.  Mr. Mendes cannot show that his trial counsel's performance was constitutionally deficient, nor can he establish that any alleged deficiency so prejudiced his cause that a different result would have occurred but for that deficiency. For these reasons his petition must be dismissed. A separate Order shall be entered reflecting the foregoing Opinion.

__3/14/06_____                    _____/s/_____
(Date)                             DEBORAH K. CHASANOW
                                   United States District Judge